IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRAVIS MASTERWOOD, | ) | CASE NO. 1:21-CV-02420-JRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Travis Masterwood ("Plaintiff" or "Masterwood"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In September 2020, Masterwood filed an application for SSI, alleging a disability onset date of

February 29, 2020 and claiming he was disabled due to: autoimmune disorder; iritis; Behcet's syndrome;

chronic bacterial proctitis; insomnia; tendonitis; bilateral shoulder pain; chronic left knee pain; chronic

bilateral wrist pain; skin ulcers; radiculopathy; abnormal blood numbers; chronic fatigue; rhinitis;

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

decreased vision; chronic neutropenia; chronic nausea; chronic sinusitis; chronic lymphopenia; night sweats; myalgia; hypophosphatasia; genital lesions; chronic anterior uveitis; hypermetropia; ADHD; and depression. (Transcript ("Tr.") 19, 104.)  The application was denied initially and upon reconsideration, and Masterwood requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 19.)

On September 13, 2021, an ALJ held a hearing, during which Masterwood, unrepresented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 28, 2021, the ALJ issued a written decision finding Masterwood was not disabled.  (*Id.* at 19-42.)  The ALJ's decision became final on December 2, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On December 29, 2021, Masterwood filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6-8.)  Masterwood asserts the following assignments of error:

(1) The ALJ committed harmful error when he failed to provide Masterwood a full and fair hearing as he did not fulfill his heightened duty to an unrepresented Claimant.

(2) The ALJ committed harmful error when the RFC failed to consider the effect of the combination of Masterwood's severe impairments and the related symptoms, along with the opinions of his treating sources, on his ability to engage in substantial gainful activity on a full-time and sustained basis.

(3) The ALJ erred when he failed to find that the waxing and waning of Masterwood's psychological symptoms would preclude him from engaging in substantial gainful activity on a full-time and sustained basis.

(Doc. No. 6.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Masterwood was born in April 1979 and was 42 years-old at the time of his administrative hearing (Tr. 19, 40), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §

416.963(c).  He has at least a high school education and is able to communicate in English.  (Tr. 41.)  He

has past relevant work as a construction worker.  (*Id.* at 40.)

## B.    Relevant Medical Evidence[2]

On February 22, 2019, Masterwood saw Jorethia Chuck, Ph.D., for a consultative psychological

evaluation.  (*Id.* at 310-15.)  Masterwood reported diagnoses of muscle tears, seizures, ADHD, and

anxiety.  (*Id.* at 310.)  Masterwood told Dr. Chuck he walked every day, took the bus, and read.  (*Id.* at

311.)  His hobbies including reading, walking, and watching YouTube.  (*Id.*)  Masterwood reported a

history of special education classes and an IEP in middle school, although he was taken off his IEP in high

school.  (*Id.*)  He completed his GED two years ago.  (*Id.*)  Masterwood reported his last job was working

as a laborer for a flooring company.  (*Id.* at 312.)  He got along well with his coworkers and supervisor.

(*Id.*)  Masterwood reported handling work pressures well.  (*Id.*)  Masterwood told Dr. Chuck he took

Prozac, which helped, although it gave him nightmares.  (*Id.*)  He had been on the medication for two to

three weeks.  (*Id.*)  Masterwood reported a lot of anxiety, worrying, feeling regretful, anger and irritability,

hearing voices, and daily suicidal thoughts with no plan.  (*Id.*)  Dr. Chuck called the Mobil Crisis unit, and

since Masterwood had no intent to harm anyone, the Mobile Crisis Unit suggested Dr. Chuck call the

Crisis Stabilization Unit.  (*Id.*)  Dr. Chuck called the Crisis Stabilization Unit, but there were no male beds

open.  (*Id.*)  The Unit suggested Masterwood call 211 if he began having suicidal or homicidal thoughts.

(*Id.*)  Masterwood complained of difficulty falling and staying asleep.  (*Id.*)  He reported he had the ability

to bathe, dress, and groom himself, the ability to cook his own food and do his laundry, and the ability to

do his household chores.  (*Id.* at 312-13.)  Masterwood told Dr. Chuck he rode the bus to the gym every

day.  (*Id.* at 313.)

On examination, Dr. Chuck found Masterwood pleasant and well-mannered, no delusions or

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

paranoia, with good eye contact.  (*Id.*)  Dr. Chuck noted Masterwood appeared tense at first but appeared to relax during the interview.  (*Id.*)  Masterwood recited three objects immediately and one object after five minutes.  (*Id.*)  Masterwood could recite five digits forward and four digits backward.  (*Id.*)  Dr. Chuck estimated Masterwood's cognitive functioning was in the low average range based on education, presentation, and work history.  (*Id.*)  Masterwood appeared to have a limited fund of knowledge.  (*Id.* at 313-14.)  Masterwood's insight and judgment appeared intact.  (*Id.* at 314.)  Dr. Chuck diagnosed Masterwood with major depressive disorder, recurrent, with psychotic features, and generalized anxiety disorder.  (*Id.*)

Dr. Chuck opined Masterwood would have problems understanding and remembering given his level of intrusive thoughts and did not appear capable of maintaining attention and concentration as he was unable to do the memory task correctly.  (*Id.* at 314-15.)  Dr. Chuck further opined Masterwood would have difficulty in maintaining persistence and pace as he was "often distracted by intrusive thoughts."  (*Id.* at 315.)  Dr. Chuck opined Masterwood had the ability to respond appropriately to supervision.  (*Id.*)  Dr. Chuck further opined Masterwood's ability to withstand the stresses and pressures of day-to-day work activities was impaired, and his adjustment levels were "likely to deteriorate under the pressures of a normal work setting."  (*Id.*)

On May 14, 2019, Masterwood saw Ann Harrington, APRN-CNS, for follow up.  (Tr. 326.)  Masterwood reported bilateral knee pain that he rated a 5/10.  (*Id.*)  Masterwood reported that since starting Cymbalta his mood and related symptoms had improved by 60%, although he was unable to tell if it helped with his pain.  (*Id.* at 327.)  Masterwood stated his left knee swelling had resolved.  (*Id.*)  Masterwood endorsed joint pain in his wrists and back pain but denied any psychiatric symptoms.  (*Id.* at 330.)  On examination, Harrington found tenderness to palpation over the patellar tendon on the left knee but no edema, effusion, or erythema, and on the right, no tenderness, edema, effusion, or erythema, full

range of motion, and crepitus.  (*Id.* at 332.)  Harrington noted that x-rays of the bilateral knees revealed soft tissue swelling anterior to the knee joint which indicated inflammation.  (*Id.*)  Masterwood reported that since starting Cymbalta his "migrating" body pain had resolved and his sleep was "much better." (*Id.*)  While he still had "constant pain," it was less severe.  (*Id.*)  Harrington increased Masterwood's dosage of Cymbalta.  (*Id.*)

On August 3, 2019, Masterwood went to the emergency room for suicidal ideation.  (*Id.* at 294.) Treatment providers noted they were unsure whether Masterwood was actually depressed and having suicidal and homicidal thoughts, and were uncertain whether Masterwood was a hypochondriac, had poor understanding of his illness, or whether stopping Cymbalta was causing his symptoms.  (*Id.*)  Masterwood was discharged in stable condition with psychiatric resources.  (*Id.*)

On November 21, 2019, Masterwood underwent a Functional Capacity Evaluation with James McDonald, PT.  (*Id.* at 358.)  McDonald determined Masterwood demonstrated full effort during the evaluation.  (*Id.* at 359.)  McDonald opined Masterwood had the ability to perform light work full-time with the need to alternate sitting and standing and with occasional tolerance for bending, forward reaching, fine coordination, gross coordination, pinching, simple grasping, stair climbing, and walking. (*Id.*)  Masterwood should avoid static balance, firm grasping, and squatting.  (*Id.*)

On March 13, 2020, Sonji Boyd, M.D., stated she had been Masterwood's primary care physician since December 2019 and that after receiving several doses of Cipro, Masterwood developed a host of new medical conditions, including encephalitis, delirium, visual and auditory hallucinations, joint pain, skin rashes, memory impairment, "'disassociations,'" "odd behavior," anxiety so severe he could no longer interact with customers and had to dissolve his successful floor restoration business, left shoulder pain, chronic knee pain, right shoulder pain, persistent yeast infections, dysuria, polyuria, sleep difficulties, neutropenia, fevers, chronic pharyngitis resulting in tonsillectomy, vision impairment, skin

5

abscesses, brain fog, and generalized musculoskeletal pain. (*Id.* at 366-67.) Dr. Boyd reported Masterwood was evaluated for disability on November 25, 2019, and his Oswestry Disability Index revealed severe disability. (*Id.* at 367.)

On May 27, 2020, Masterwood saw Jessica Sinur, LPCC, for a mental health assessment. (*Id.* at 389-91.) Masterwood reported he had been diagnosed with Behcet's syndrome a week ago and it was causing mental health symptoms. (*Id.* at 389.) Masterwood reported his mental health symptoms overlapped with his Behcet's symptoms. (*Id.* at 390.) Masterwood complained of nightmares, paranoia, confusion, inability to think deeply, bad anxiety, suicidal thoughts every day, difficulty maintaining trains of thought and following complicated conversation, getting sick every time he gets stressed, depressed mood most days, anhedonia, no energy, feelings of worthlessness/hopelessness, trouble sleeping, poor concentration, excessive worry, chest tension, and violent thoughts. (*Id.*) Based on Masterwood's reported symptoms, Sinur diagnosed Masterwood with MDD, recurrent, moderate, r/o anxiety disorder due to another medical condition and depressive disorder due to another medical condition. (*Id.*)

On June 8, 2020, Masterwood saw Brian Heinz, LPC, for counseling. (*Id.* at 373.) Masterwood reported fatigue, anxiety, brain fog, loss of work and relationships, depression, anxiety, paranoia, nightmares, inattention, and anger. (*Id.*) Masterwood told Heinz the more he did, the sicker he got. (*Id.*) On examination, Heinz found Masterwood alert and oriented with fair insight and judgment. (*Id.*)

On June 11, 2020, Masterwood saw Heinz for follow up. (*Id.* at 374.) Heinz noted Masterwood had made moderate progress, his mood was improving, and he was more hopeful. (*Id.* at 375.) Masterwood reported anxiety preceded his lesions. (*Id.* at 378.) Masterwood reported using walking and playing guitar as coping mechanisms. (*Id.*)

On June 18, 2020, Heinz noted Masterwood had made moderate progress in this treatment. (*Id.* at 379-80.) Masterwood reported feeling sick and tired and having low motivation. (*Id.* at 383.)

Masterwood told Heinz he wanted to be more active, but he felt worse physically the more active he was. (*Id.*)  Masterwood reported he had a web project due the next week and was having difficulty concentrating.  (*Id.*)  On examination, Heinz found Masterwood alert and oriented with fair insight and judgment.  (*Id.*)

On July 2, 2020, Masterwood went to the emergency room complaining of generalized weakness, fatigue, brain fog, and painful oral ulcers.  (*Id.* at 304.)  On examination, treatment providers found multiple ulcers of the upper lip and upper gums, mild swelling of the upper lip, intact sensation, and normal extremities with normal tone and full strength.  (*Id.* at 304-05.)  Treatment providers administered pain medication and offered lidocaine for Masterwood's mouth pain, which he declined.  (*Id.* at 305.)  On further evaluation, Masterwood reported his symptoms had improved and he was walking comfortably around the emergency department.  (*Id.*)  Masterwood stated he felt comfortable being discharged home. (*Id.*)

On July 13, 2020, Masterwood saw Frank Sajen, PA, for a psychiatric evaluation.  (*Id.* at 399.) Masterwood reported physical issues, poor sleep, and good diet.  (*Id.* at 403.)  Since he lost his job, Masterwood spent his time rising his bike to the bookstore daily to read, learning to play the guitar, and learning German.  (*Id.*)  Masterwood told Sajen he did this to keep his mind sharp since he felt his memory had worsened since becoming sick.  (*Id.*)  Masterwood reported his depression caused suicidal thoughts.  (*Id.*)  Masterwood also complained of anxiety.  (*Id.*)  On examination, Sajen found good eye contact, normal muscle strength and tone, normal attention and concentration, euthymic mood and affect, normal speech, logical thought process, intact associations, normal fund of knowledge, normal recent and remote memory, and fair judgment and insight.  (*Id.* at 405.)  Sajen started Masterwood on Zoloft.  (*Id.*)

On September 2, 2020, Masterwood saw Sajen for follow up.  (*Id.* at 392.)  Masterwood reported no change in his mood since his last appointment, as well as continued poor sleep and good diet.  (*Id.* at

7

397.)  Masterwood denied any suicidal or homicidal thoughts, although he still had occasional crying spells.  (*Id.*)  On examination, Sajen found good eye contact, normal strength and muscle tone, normal attention and concentration, normal speech, euthymic mood, logical thought process, intact associations, normal fund of knowledge, intact recent and remote memory, and fair insight and judgment.  (*Id.* at 398.)

On October 19, 2020, Masterwood saw Heinz for follow up.  (*Id.* at 384.)  Heinz noted Masterwood had made moderate progress, was in less pain, and was starting school.  (*Id.* at 385.)  Masterwood reported he felt better that day, although he had been sick for the past month with a skin rash and "'30 day flare up'" of his physical symptoms.  (*Id.* at 388.)  Masterwood told Heinz he was starting college that day and was excited and hopeful about school.  (*Id.*)  Masterwood planned to do his schoolwork in the morning before he ran out of energy in the afternoon.  (*Id.*)  On examination, Heinz found Masterwood alert and oriented with fair judgment and insight.  (*Id.*)

On November 18, 2020, Nancy Wasserbauer, D.O., wrote a letter stating Masterwood suffered from Behcet's disease, "a type of inflammatory disorder which affects multiple parts of the body," with the most common symptoms being "painful ulcerations and inflammation of parts of the eye and joints." (*Id.* at 408.)  The sores tended to last a few days and could "come and go randomly, making their occurrence difficult to predict."  (*Id.*)  Treatment was not always effective, making it "difficult" for Masterwood to plan his daily activities.  (*Id.*)  Dr. Wasserbauer opined Masterwood's "residual functional capacity is limited at this time."  (*Id.*)

Masterwood continued counseling sessions through the rest of 2020.  (*Id.* at 452, 457, 462.)  In November 2020, Masterwood reported suicidal thoughts.  (*Id.* at 452.)  Heinz noted Masterwood was still taking classes.  (*Id.*)  On examination, Heinz found Masterwood alert and oriented with fair insight and poor judgment.  (*Id.*)  Later that month, Masterwood reported studying for school and was sick for a week after.  (*Id.* at 457.)  Masterwood told Heinz he wanted to be admitted for in-patient treatment because he

was having more frequent suicidal thoughts.  (*Id.*)  Masterwood asked Heinz for a referral and then hung up on Heinz.  (*Id.*)  On examination, Heinz found Masterwood alert and oriented with poor insight and judgment.  (*Id.*)  In December 2020, Masterwood reported suicidal thoughts often daily.  (*Id.* at 462.)  On examination, Heinz found Masterwood alert and oriented, with fair insight, poor judgment, and paranoid and racing thoughts.  (*Id.*)  Later that month, although Masterwood reported rash, inflammation, and pressure against his spinal cord, along with paranoid and violent thoughts in connection with those symptoms, Masterwood finished his semester of school.  (*Id.* at 467.)  On examination, Heinz found Masterwood alert and oriented with fair insight and good judgment.  (*Id.*)  Heinz continued to find moderate progress during this time period.  (*Id.* at 449, 454, 459, 464.)

On December 9, 2020, Masterwood saw Sajen for psychiatric follow up.  (*Id.* at 478.)  Masterwood reported depression about his physical condition and intermittent suicidal thoughts.  (*Id.* at 483.)  On examination, Sajen found good eye contact, normal attention and concentration, euthymic mood and affect, normal speech, logical thought process, intact associations, normal fund of knowledge, normal recent and remote memory, and fair judgment and insight.  (*Id.* at 484.)

On January 14, 2021, Masterwood saw Heinz for follow up.  (*Id.* at 468.)  Heinz noted moderate progress and that Masterwood's health was "greatly improved."  (*Id.* at 469.)  Masterwood reported feeling better physically and mentally, he denied recent flares, and he was more motivated, although he still had some anxiety.  (*Id.* at 472.)  On examination, Heinz found Masterwood alert and oriented with good judgment and insight.  (*Id.*)

On January 19, 2021, Masterwood saw Alysse Boyd, PA-C, to establish care after a previous diagnosis of Behcet's disease.  (*Id.* at 760, 767.)  Masterwood reported constant joint pain that was worst in the lower back, mouth sores, rashes, morning stiffness that was better with activity, pain that was better with activity, congestion, nausea, and blurry vision.  (*Id.* at 760.)  On examination, Boyd found no active

joint synovitis, no erythema, swelling, or pain with palpation, full range of motion, and no tenderness to palpation of the spine and sacroiliac joint.  (*Id.* at 764.)  Boyd wrote:

> Patient does not have clear evidence of Uveitis based on prior eye exams, he also does not have any active ulcers.  No synovitis noted on exam.  Overall patient appears to have subjectively responded to colchicine for his genital ulcers and ok to continue this for Recurrent apthus stomatitis like symptoms.  At this time does not meet criteria for systemic immunosuppression, will follow up with ophthalmology next week for his blurry vision.

(*Id.* at 760.)

On February 10, 2021, Masterwood saw rheumatologist Sumi Gopal, M.D., for follow up after a "questionable diagnosis of [B]ehcet's disease."  (*Id.* at 751.)  Masterwood reported frustration from a lack of improvement of his symptoms.  (*Id.*)  Masterwood complained of ongoing oral ulcers and joint pains. (*Id.*)  Dr. Gopal noted that "again" there was no evidence of iritis in Masterwood's eye exams but Masterwood reported continued blurred vision.  (*Id.*)  On examination, Dr. Gopal found no active oral ulcers, scattered erythematous rash on Masterwood's back spanning 4 mm, no active synovitis, no erythema, swelling, or pain with palpation, and full range of motion.  (*Id.* at 756.)  Dr. Gopal stated:

> This patient does not have any physical exam criteria to meet diagnosis of Behcet's disease, his symptoms are subjective in nature.  He does appear to have some acneform lesions on his back.  NOTE: He does NOT have any hx of documented iritis on his ophthalmology exams.  When reviewing his chart his eye exam from March 2020 gives only dx of astigmatism/hypermetropia and asthenopia…the subsequent note in July 2020 states "no evidence of uveitis" but was given referral to Dr. Kurup where his notes since then also note "no active ocular disease".
>
> However I am willing to trial a course of medrol dose pack to see if this will give him relief of his subjective inflammatory joint pain/rash/blurred vision/intermittent ulcers.  The risks and benefits of therapy were extensively discussed with this patient.

(*Id.* at 751.)

On February 15, 2021, Masterwood saw Sajen for follow up.  (*Id.* at 486.)  Masterwood reported Seroquel helped his sleep, which in turn improved his mood.  (*Id.* at 491.)  Masterwood's main complaint

that day was his focus.  (*Id.*)  Masterwood told Heinz he had been diagnosed with ADHD a few years earlier and he was struggling to finish his school projects.  (*Id.*)  Masterwood reported his depression was "fairly controlled."  (*Id.*)  On examination, Sajen found good eye contact, normal attention and concentration, euthymic mood and affect, normal speech, logical thought process, intact associations, normal fund of knowledge, normal recent and remote memory, and fair judgment and insight.  (*Id.* at 492.)

On February 17, 2021, Masterwood saw Elena Randazzo, M.D., for evaluation and management of his Behcet's syndrome.  (*Id.* at 437.)  Masterwood told Dr. Randazzo he had been diagnosed with Behcet syndrome by his immunologist eight months ago, and his rheumatologist had referred him to Dr. Randazzo for assistance in managing his "suspected Behcet syndrome."  (*Id.* at 438.)  Masterwood reported oral ulcers twice a month, genital ulcers every three months, tooth loss, recently diagnosed uveitis, brain fog, memory difficulties, diffuse muscle and joint pain, weakness, morning nausea, difficulty with complex problem solving and having conversations with others, long and short-term memory problems, night sweats, intermittent tingling in his fingers and toes bilaterally, and improved strength after a course of steroids.  (*Id.*)  On examination, Dr. Randazzo found full strength, full range of motion, no joint swelling, intact sensation, normal gait, normal finger to nose testing, no rashes, and normal mood and behavior.  (*Id.* at 440.)  Jisna Paul, MBBS, who saw Masterwood along with Dr. Randazzo, noted, "From the exam today, I think there is enough evidence to consider a diagnosis of Behcet's syndrome (recurrent oral and genital ulcers, recent diagnosis of uveitis)."  (*Id.*)  Dr. Paul ordered further work up to rule out differentials such as lupus and ANCA vasculitis and prescribed a prednisone taper and other medication after Masterwood underwent a brain MRI.  (*Id.*)

On February 23, 2021, Masterwood saw Heinz for follow up.  (*Id.* at 473.)  Heinz noted moderate progress and that Masterwood was feeling helpful about his treatment for his Behcet's syndrome.  (*Id.* at 474.)  Masterwood reported seeing a Behcet's specialist and was prescribed a steroid, which helped him

11

feel more goal-oriented, stronger, more mentally stable, and not sick after he exercised.  (*Id.* at 477.) Masterwood told Heinz he had to switch hormones and his symptoms returned during the switch, including "extreme" sadness, anxiety, and crying.  (*Id.*)  Although Masterwood worried about getting false hope and getting sick again, he was feeling hopeful and motivated.  (*Id.*)  Masterwood reported walking daily, planning to take more classes in the summer, staying busy with cryptocurrency trading, and getting to know a woman in Africa he planned on marrying.  (*Id.*)  On examination, Heinz found Masterwood alert and oriented with fair insight and judgment.  (*Id.*)

On February 27, 2021, Masterwood completed an Adult Function Report.  (*Id.* at 224-34.) Masterwood reported he was "extremely sensitive to the slightest amount of stress" and that his body was "constantly inflamed."  (*Id.* at 224.)  He spent his days sleeping, waking up to urinate, taking his medication, and fighting fevers, rash, fatigue, and other symptoms.  (*Id.* at 225.)  His mother brought him food.  (*Id.*)  He went to bed at 5:00 p.m. because he was exhausted by 4:00 p.m.  (*Id.*)  Masterwood "rarely" left the house because of his chronic fatigue, he only bathed every two weeks because of fatigue, he had no hair because of his Behcet's syndrome, he rarely shaved because of skin issues from inflammation, he mainly ate blended food because of his mouth ulcers, and his mother helped him with all his personal care.  (*Id.*)  He needed phone reminders to take care of his personal hygiene and take his medication.  (*Id.* at 226.)  He never prepared his own meals.  (*Id.*)  He could not do yard work because his joints were "constantly inflamed."  (*Id.*)  He went outside once a month because he did not have the energy and he is afraid of people.  (*Id.* at 227.)  He cannot go out alone because he becomes too nervous. (*Id.*)  He does not shop.  (*Id.*)  His memory and focus have declined from brain inflammation.  (*Id.*)  His friends and family abandoned him.  (*Id.* at 228.)  He can walk 20 feet before resting for five minutes.  (*Id.* at 229.)  He cannot follow spoken or written instructions completely and he does not get along with

anyone.  (*Id.*)  He attacked one of his clients.  (*Id.*)  He cannot handle stress and becomes confused with changes in routine.  (*Id.* at 230.)  He experienced suicidal thoughts every day.  (*Id.* at 231.)

On February 26, 2021, Masterwood saw Patricia Kountz, APRN-CNP, for complains of lip pain, ulcers, tooth loss, hair loss, and autoimmune issues.  (*Id.* at 736, 743.)  Masterwood reported he had seen his rheumatologist two days ago and the rheumatologist had given him steroids again.  (*Id.* at 736.)  On examination, Kountz found abnormal nasal mucosa, septum, and turbinates, multiple mouth sores, abnormal lips, teeth, and gums, abnormal oropharynx, normal gait and station, no joint swelling, normal range of motion, normal stability, normal strength, normal skin, intact sensation, normal coordination, intact judgment and insight, and normal mood and affect.  (*Id.* at 742.)

On March 9, 2021, Masterwood saw Heinz for follow up.  (*Id.* at 609.)  Heinz noted moderate progress and that Masterwood's health was improving.  (*Id.* at 610.)  Masterwood reported his mood was improved and stable, he had low motivation but was still feeling better, he had no recent flare ups of his Behcet's disease, and his sleep had improved.  (*Id.* at 613.)  On examination, Heinz found Masterwood alert and oriented with fair insight and good judgment.  (*Id.*)  Masterwood ended his session early because he was "out in public."  (*Id.*)

On March 16, 2021, Masterwood went to the emergency room reporting suicidal and homicidal thoughts.  (*Id.* at 516.)  In the emergency room, treatment providers found full range of motion of all extremities, full and equal strength, intact sensation, normal skin, and unremarkable gait.  (*Id.* at 518.)  Treatment providers admitted Masterwood to inpatient psychiatry.  (*Id.*)  On psychiatric admission, treatment providers found a depressed mood, restricted range of affect, normal speech, although Masterwood appeared anxious, logical thought form with concrete associations, suicidal and homicidal thoughts, full orientation, sustained memory and attention, and poor insight and judgment.  (*Id.* at 522-23.)  During his stay, treatment providers started him on Risperdal, increased his Zoloft, stopped his steroid

13

medication, and decreased his azathioprine. (*Id.* at 526, 536, 557.) During Masterwood's stay, treatment providers noted full and active participation in group therapy with appropriate interaction with his peers. (*Id.* at 554.) A brain MRI taken during his stay was normal. (*Id.* at 564.) Treatment providers discharged Masterwood on March 19, 2021. (*Id.* at 565.) On examination at discharge, Masterwood demonstrated calm and cooperative behavior, normal speech, full orientation, good mood and congruent affect, linear and organized thought process, normal thought content and perception, good insight and judgment, sustained attention and concentration, adequate memory, and good fund of knowledge. (*Id.*)

On March 29, 2021, Masterwood saw Dr. Wasserbauer for a telehealth visit. (*Id.* at 713, 718.) Masterwood reported his current treatment plan was effective and daily low dose Bactrim had prevented recurrent infections. (*Id.* at 713.) While he "frequently" felt sick, he felt better on daily Bactrim. (*Id.*)

On March 30, 2021, Masterwood saw Daniel Miller, M.D., for follow up. (*Id.* at 707, 712.) Masterwood reported being stable neurologically since his last follow up. (*Id.* at 707.) Dr. Miller noted a 2019 EMG showed no definite evidence of neuromuscular junction disorder and that lab work had shown negative results to acetylcholine receptor and MUSK antibodies. (*Id.*)

On April 8, 2021, Masterwood saw PA Sajen for psychiatric follow up. (*Id.* at 629.) On examination, Sajen found good eye contact, normal attention and concentration, euthymic mood, logical thought process, intact associations, normal fund of knowledge, normal recent and remote memory, and fair judgment and insight. (*Id.* at 635.)

On April 13, 2021, Masterwood saw Susan Flick, APRN-CNP, to establish care. (*Id.* at 701, 706.) Masterwood complained of chronic, intermittent pelvic pain, urologic symptoms, and poor sleep. (*Id.* at 701.) Masterwood also reported poor energy and sinus congestion. (*Id.*) Masterwood denied arthralgias, gait abnormality, skin lesions, suicidal thoughts, anxiety, and depression. (*Id.* at 702.) On examination, Flick found no lower extremity edema, no difficulty with ambulation, moist mucosa, no neurological

14

deficits, and no CVA/spinal tenderness. (*Id.* at 706.)

On April 20, 2021, Masterwood saw Mamta Chura, M.D., for an increase in his pain medication. (*Id.* at 680, 684.) Masterwood reported constant diffuse body pain that he described as dull and achy and worse with work, stress, and exercise. (*Id.* at 680.) Masterwood also complained of poor sleep and chronic fatigue. (*Id.*) Masterwood told Dr. Chura his rheumatologist only prescribed 12 tabs of Tylenol #3 a month and he needed more than that. (*Id.*) On examination, Dr. Chura found notmal extremities, no skin rashes, lesions, or ulcers, normal gait, and normal neurologic exam. (*Id.* at 684.) Dr. Chura declined to increase Masterwood's Tylenol #3. (*See id.*) Dr. Chura offered a ketamine infusion instead, which Masterwood refused. (*Id.* at 680.)

That same day, Masterwood saw Heinz for follow up. (*Id.* at 619.) Heinz noted moderate progress and that Masterwood had more energy and an improved mood. (*Id.* at 620.) Masterwood reported his pain management medication was denied because of its addictive nature and Masterwood was taking a larger dose than prescribed. (*Id.* at 623.) Masterwood stated his other medications were affective and he was feeling good with more energy. (*Id.*) Masterwood told Heinz he had been spending more time on home repairs, renovating the third floor of his mother's house. (*Id.*) Masterwood reported working three days in a row, several hours a day, with brief breaks. (*Id.*) Masterwood stated he felt he had been more productive and thought some of that was the result of a 30-day Facebook ban. (*Id.*) On examination, Heinz found Masterwood alert and oriented with good insight and judgment. (*Id.*)

On May 4, 2021, Masterwood saw Dr. Wasserbauer for follow up. (*Id.* at 675, 679.) Masterwood reported Otezla was helping but he wanted to use low dose daily Bactrim as he felt it worked better for infection prevention. (*Id.* at 675.) Masterwood denied skin lesions, anxiety, and depression. (*Id.* at 676.)

That same day, Masterwood saw Heinz for follow up. (*Id.* at 624.) Heinz noted moderate progress and that Masterwood had a stable mood and no Behcet's flares. (*Id.* at 625.) Masterwood

reported an electrical fire at their house that had caused them to be homeless and living in a hotel. (*Id.* at 628.) Masterwood stated his mood had been good, he had been goal-oriented in getting housing and utilizing resources, and he was hopeful about the future. (*Id.*) On examination, Heinz found Masterwood alert and oriented with good insight and judgment. (*Id.*)

On June 1, 2021, Masterwood saw Heinz for follow up. (*Id.* at 643.) Masterwood reported a Behcet's flare over the past few weeks that had lasted longer but was less severe. (*Id.*) Masterwood told Heinz he was having occasional suicidal thoughts and was worried they would get worse as they had before. (*Id.*) Masterwood reported being out of his sleep medication because it was lost in the house fire, and he thought his sleep problems were part of the cause of him not feeling well. (*Id.*) On examination, Heinz found Masterwood generally relaxed and engaged with normal speech, neutral mood, appropriate affect, unremarkable thought content and perception, and appropriate judgment and insight. (*Id.* at 643-44.) Heinz noted minimal improvement. (*Id.* at 644.)

At a follow up visit on June 8, 2021, Flick found similar findings on examination. (*Id.* at 657-65.)

On June 10, 2021, Masterwood saw PA Sajen for psychiatric follow up. (*Id.* at 639.) Masterwood reported mild hopelessness. (*Id.*) Masterwood told Sajen that after the house fire he was in a hotel, but he ran out of money and was now in a shelter. (*Id.* at 640.) Masterwood continued to work on the house, but repairs had been expensive, and he was looking into housing options. (*Id.*) Masterwood reported doing much better physically and that his medications for his Behcet's syndrome were helping. (*Id.*) Masterwood told Sajen he was not going to let the house fire stop the physical progress he has made. (*Id.*) Sajen noted Masterwood was forward thinking. (*Id.*) Masterwood reported stable diet and sleeping well. (*Id.*) On examination, Sajen found normal speech, a full range of affect, neutral/euthymic mood, normal thought content, normal thought process, appropriate insight, fair judgment, and intact memory. (*Id.*)

On August 8, 2021, Masterwood went to the emergency room reporting an unwitnessed seizure the

night before. (*Id.* at 778.) Masterwood told treatment providers he woke up and found his chest and arms tense and locked up. (*Id.*) He reported the episode lasted for ten seconds and then he went back to sleep. (*Id.*) He had experienced a similar episode three years before. (*Id.*) Treatment providers found Masterwood in no acute distress and a physical examination was benign except for elevated blood pressure. (*Id.*) Treatment providers directed Masterwood to follow up with neurology. (*Id.*)

**C.    State Agency Reports**

**1.        Mental Impairments**

On November 7, 2020, Jennifer Whatley, Ph.D., reviewed the file and opined Masterwood had moderate limitations in his abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 107-08.) Dr. Whatley adopted the mental RFC from the ALJ decision dated April 29, 2020 based on AR 98-4. (*Id.* at 108.)

On March 4, 2021, on reconsideration, David Dietz, Ph.D., affirmed Dr. Whatley's findings. (*Id.* at 116-17.)

**2.        Physical Impairments**

On November 5, 2020, Maureen Gallagher, D.O., reviewed the file and opined Masterwood could perform light work with additional limitations. (*Id.* at 109.) He could occasionally use ramps and stairs but never climb ladders, ropes, or scaffolds. (*Id.*) He could occasionally balance, kneel, stoop, crouch, and crawl. (*Id.*) Masterwood could never reach overhead with the right upper extremity but could frequently reach all around with the right upper extremity. (*Id.*) Dr. Gallagher adopted the physical RFC from the ALJ decision dated April 29, 2020 based on AR 98-4. (*Id.*)

On March 6, 2021, on reconsideration, W. Scott Bolz, M.D., affirmed Dr. Gallagher's findings. (*Id.* at 119.)

17

**D.** **Hearing Testimony**

During the September 13, 2021 hearing, Masterwood testified to the following:

- He is homeless. (*Id.* at 56.) He lives alone in the house that caught fire. (*Id.*) The house has no working utilities. (*Id.*) He has a driver's license. (*Id.* at 57.) He drives every other day to the YMCA so he can sit in the steam room or sauna, which helps calm the inflammation somewhat. (*Id.*)

- He has his GED. (*Id.* at 58.) He once owned a flooring and installation business. (*Id.* at 58-59.) He failed to pay taxes and lacked the professional knowledge of running a business. (*Id.* at 59.)

- The variety and consistency of his symptoms prevent him from working. (*Id.* at 62.) The more he tries to push through his symptoms, the worse they get. (*Id.*) All the symptoms in his medical record, even the minor ones, cause limitations and pain. (*Id.*) He has "very low grade" pain all the time throughout his entire body. (*Id.* at 63.) Stress worsens his pain. (*Id.*) His pain is a 4/10 on an average day with medication. (*Id.*) Without medication, his pain is a 7/10 on an average day. (*Id.*) He can sit for twenty minutes and stand for twenty minutes. (*Id.* at 64.) His abilities are based on stress level. (*Id.*) If he walked a block every single day, eventually he would only be able to walk half a block. (*Id.*) Eventually, he would not be able to walk at all. (*Id.*) On a regular day, he could easily walk one or two blocks. (*Id.*) He can lift 30 pounds. (*Id.*) He needs to use phone reminders all the time. (*Id.*)

- He spends his time online and going to the YMCA. (*Id.* at 65.) He watches YouTube and conducts research online. (*Id.*) He goes on Facebook sometimes but not often. (*Id.*) He can make change and count money. (*Id.* at 66.) He can sweep and mop the small area he lives in. (*Id.*) He cannot clean when he is in a flare. (*Id.*) He can do chores for half an hour before needing to take a break. (*Id.*) He has done yard work at the house. (*Id.*) In repairing his house after the fire, over the course of three months he cleaned the house out from top to bottom. (*Id.* at 67.) He worked on the front yard. (*Id.*) He did not take care of the attic because he did not want to be exposed to chemicals. (*Id.*) He was 2/3 of the way done with cleaning and painting the basement. (*Id.*)

- Seroquel makes him feel detached in the mornings, but without it he won't sleep. (*Id.*) His symptoms have gotten better and more consistent since September 2020. (*Id.* at 68.) He does light weight exercises when he goes to the Y. (*Id.*)

- If he reads too long, he starts to get sick. (*Id.* at 69.) If he pushes through his symptoms, he gets encephalitis. (*Id.*) He has to train himself to keep his immune response "to an absolute minimum" so he can live normally. (*Id.*) His flares are causing permanent damage. (*Id.*) He may get a flare once a month and it will last about a week, although it is less severe. (*Id.* at 70.) However, he is not doing anything. (*Id.* at 71.)

18

The VE testified Masterwood had past work as a construction worker.  (*Id.* at 72.)  The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual with the claimant's age and education and with the past position that you've identified.  Now assume that the hypothetical individual is limited as follows: to light except he can occasionally use ramps and stairs but can never use ladders or ropes or scaffolds.
>
> He can occasionally balance, kneel, stoop, crouch and crawl.  He can never reach overhead with the right upper extremity and can frequently reach all around with the right upper extremity.  He is limited to simple tasks and routine and repetitive tasks.  He is not able to perform at a production rate pace assembly line work but can perform goal oriented work i.e. office cleaner.  He is limited to static work environment tolerating few changes in a routine work setting and when set changes do occur they would need to take place gradually and would incur [sic] infrequently.  First, can that hypothetical [sic] perform the past position as you've identified as actually performed or generally performed?

(*Id.* at 73.)

The VE testified the hypothetical individual would not be able to perform Masterwood's past work as a construction worker.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, garment sorter, and router.  (*Id.* at 74.)

The ALJ then posed a second hypothetical:

> In my second hypothetical again assume a hypothetical individual of the claimant's age and education and the past position that you've identified.  Now assume that the hypothetical individual is limited as follows: to light except he can never reach overhead with the right.  He can frequently reach in all other directions with the right.  Occasionally climb ramps and stairs.  Never climb ladders or ropes or scaffolds.  Occasionally balance, stoop, kneel, crouch, crawl.  Never be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle.  Has the ability to understand, remember, apply information, concentrate, persist and maintain pace to perform simple, routine and repetitive tasks but not at a production rate pace i.e. assembly line work.  Limited to simple work related decisions in using his judgment and dealing with changes in the work setting and able to frequently interact with supervisors, co-workers and the public.  Does that change your response to hypothetical number 1 to either the past work or the other positions that you've identified or do they remain the same?

(*Id.* at 75.)  The VE testified the answers remained the same.  (*Id.*)

19

The ALJ further modified the second hypothetical to limit the hypothetical individual to occasional interaction with supervisors, co-workers, and the public.  (*Id.*)  The VE testified the answers remained the same.  (*Id.*)

The ALJ further modified the second and third hypotheticals to limit the hypothetical individual to a static work environment tolerating few changes in a routine work setting and when changes did occur, they would need to take place gradually and occur infrequently.  (*Id.*)  The VE testified the answers remained the same.  (*Id.*)

The ALJ modified the hypotheticals to the sedentary level of exertion.  (*Id.* at 76.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as table worker, ink printer, and dial marker.  (*Id.*)

### III.   STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or

20

medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since September 28, 2020, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: mild lumbar spondylosis, trace subacromial subdeltoid bursitis of the right shoulder, Behcet's syndrome, chronic prostatitis, uvelitis [sic], hyperestrogenism, depression, and anxiety. (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally use ramps and stairs but can never use ladders, ropes, or scaffolds. He can occasionally balance, kneel, stoop, crouch, and crawl. He can never reach overhead with the right upper extremity, and can frequently reach all around with the right upper extremity. He is limited to simple tasks and routine and repetitive tasks. He is not able to perform at a production rate pace (e.g. assembly line work) but can perform goal-oriented work (e.g., office cleaner). He is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, they would need to take place gradually and would occur infrequently.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on April **, 1979 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since September 28, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 22-42.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260

23

(E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    First Assignment of Error: Due Process

In his first assignment of error, Masterwood argues the ALJ erred by failing to ask Masterwood, who was unrepresented at his hearing, whether he had a chance to review the documents in the claim file before the hearing. (Doc. No. 6 at 9.)  In addition, while Masterwood was contacted after the hearing and he stated that no evidence was missing, "there was no indication that anyone had reviewed the medical evidence with him (Tr. 277)."  (*Id.*)  Masterwood asserts, "The evidence does not support the fact that the ALJ fulfilled his heightened duty as established by both regulation and case law."  (*Id.*) Masterwood argues this constituted "harmful and reversible error."  (*Id.*)

The Commissioner responds that the ALJ went over Masterwood's right to counsel, confirmed he understood that right, and offered to continue the hearing for Masterwood to obtain counsel. (Doc. No. 7 at 11.)  The ALJ confirmed Masterwood received a copy of the record before the hearing, and while Masterwood thought a few records may have been missing, Masterwood thought an attorney had resolved the issue. (*Id.*)  The ALJ had the hearing reporter go over the record with Masterwood after the hearing, and Masterwood indicated there were no missing records.  (*Id.*)  The hearing reporter advised Masterwood to notify the hearing office if anything changed.  (*Id.*)  The Commissioner argues there is no indication there were any records missing from the file, and Masterwood fails to identify any such missing records in the briefing.  (*Id.*)

In his reply, Masterwood argues that, from the record of the telephone conversation Masterwood had with the hearing reporter, "it appeared that she told him the dates which the medical records covered" instead of reading him each exhibit and informing him what the records contained.  (Doc. No. 8 at 1.)

Masterwood reasserts that "the file was devoid of any indication that [he] was able to view his file prior to the hearing." (*Id.*)

The Sixth Circuit has acknowledged that due process principles apply to Social Security proceedings. *Robinson v. Barnhart,* 124 F. App'x 405, 410 (6th Cir. 2005).  Due process requires a social security hearing be "full and fair." *Laddy v. Astrue,* 2012 WL 776551 at *11 (N.D. Ohio Feb. 2, 2012).  A claimant must have the opportunity to present all of the evidence, as well as confront the evidence against her. *Id.* (*citing Flatfor v. Chater,* 93 F.3d 1296, 1306 (6th Cir. 1996)).

The hearing transcript reveals the following discussion the ALJ had with Masterwood before the hearing:

> ALJ: Then based upon your representations on the record I'm going to find that you waived your rights to counsel, assure you that your due process rights are protected and obtain all the relevant medical and non medical records and question you at the hearing.  Now sir, in advance of the hearing the documents in our exhibit file were provided to you.  Those are Exhibits C1A-C15F.  Do you have any objection to the relevancy of those documents?
>
> CLMT: What do you mean as far as relevancy? You mean, like, accurate?
>
> ALJ: Correct.  Any objection to the proposed exhibits?
>
> CLMT: No.
>
> ALJ: I'm sorry, sir, you said no?
>
> CLMT: No. No objections.
>
> ALJ: Then I will admit Exhibits C1A-C15F into evidence excluding section C.
>
> WHEREUPON, the Exhibits previously identified were admitted into the record.
>
> ALJ: Mr. Masterwood, should I consider the record to be complete or are we missing any or [sic] your records?
>
> CLMT: *The documents that I seen*, yes there was a few records missing but I think I talked to the attorney about it.
>
> ALJ: Then what I would have you do sir following today's hearing I'd like you to stay on the line with Ms. Yacovella and speak with her about those records

25

because I want to make sure we are able to have your entire [sic] when making a determination in your case.  Does that make sense?

CLMT: Okay. Yes.

ALJ: Sir, in your conversation with Ms. Yacovella if we are missing records I'll explain what will happen.  If we are missing records we will work towards securing them for you.  When we receive them I will have them sent to you for review and comment in a process known as proffering.  Those documents can be sent to you electronically over the internet as well as we're able to provide you an encrypted CD but you can speak with Ms. Yacovella about what works for you in receiving those, okay.  If we are not missing any of your records, I'll take the case under advisement follow [sic] today and begin my deliberation.  Does that make sense?

CLMT: Yes.

ALJ: So, essentially if we are missing records my office will get them for you.  We will send them to you for review and comment in that process of proffering.  Once that's complete, I've [sic] begin deliberating.  If we have all of your records I'll begin deliberating after today's hearing, okay?

CLMT: Okay.

(Tr. 53-55) (emphasis added).

A note in the record made by the hearing reporter reads as follows:

Spoke w/ claimant following the hearing.  Went over the medical records in his file with him.  He said with the most recent ER record of 8/8/21 that we received, we are not missing anything.  I advised him if anything changes, to call and let us know.

(*Id.* at 277.)

Contrary to Masterwood's argument that "the file was devoid of any indication that Plaintiff was able to view his file prior to the hearing" (Doc. No. 8 at 1), Masterwood stated on the record that he had seen the documents and that based on that review, he thought a few records were missing but believed he had resolved the issue with an attorney.  (Tr. 54.)  The ALJ explained Masterwood should discuss the records with the hearing reporter after the hearing and explained what the process was in case some records were, in fact, missing from the record.  (*Id.* at 54-55.)  Following the hearing, the hearing reporter

26

went over Masterwood's medical records and Masterwood stated no records were missing.  (*Id.* at 277.)

Masterwood's interpretation of this file note, that "it appeared" the hearing reporter simply told

Msaterwood the dates of the records (Doc. No. 8 at 1), is speculative.  Furthermore, Masterwood points to

no authority that the hearing reporter was required to read the medical records to Masterwood to ensure

protection of his due process rights, considering Masterwood affirmatively stated he had reviewed the file.

There is no error.

## B.    Second Assignment of Error: Step Three and RFC Challenges

Masterwood's second assignment of error encompasses a host of sub-arguments spanning multiple

steps of the sequential disability evaluation, against which the undersigned has repeatedly warned

Plaintiff's counsel.[3]  The undersigned addresses each of these sub-arguments in turn.

### 1.    Listings

In a single paragraph, Masterwood argues:

> The ALJ claimed that he considered Listings 1.15, 1.16, 1.18, 14.06, 14.09, 12.04,
> and 12.06 (Tr. 23-27).  The ALJ mentioned these Listings and concluded that
> Masterwood failed to satisfy each (*Id.*).  His lengthy analysis, however, was
> limited to listing the criteria of each of the physical Listings but failed to provide
> any evidence to support his conclusions.  Thus, he failed to support his Step Three
> findings by documenting evidence which supported his conclusion.

(Doc. No. 6 at 11.)  Masterwood then devotes three paragraphs to rehashing medical evidence regarding

his physical impairments without any effort to tie that evidence to the five different listings he cited for his

physical impairments.  (*Id.* at 11-12.)  Masterwood fails to identify any potentially relevant evidence

---

[3] The undersigned notes that Masterwood's counsel is an experienced Social Security practitioner who
regularly practices in this Court and has been warned before about her continued practice of lumping
various challenges to different steps of the sequential disability evaluation together. *See, e.g.,* Case No.
1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5
(filed 2/2/2022); Case No. 5:21-cv-01721, n. 5 (filed 4/14/2022); *see also* Case No. 5:20-cv-01340, Doc.
No. 21, p. 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021).
Counsel's failure to present arguments in a way that the Court can address them, and Defendant can
respond to them, may result, in the future, in the Court deeming an argument to be improper and/or
declining to grant a requested page extension.

regarding his mental impairments at all in this discussion.[4]  (*Id.*)  It is not for this Court to make Masterwood's arguments for him.  The Court finds any physical Listings challenge waived for lack of development.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived").

In his third assignment of error, addressed here, Masterwood argues the ALJ erred in evaluating Listings 12.04 and 12.06, as he interprets the evidence as showing more than moderate limitations in each of the "B" criteria.  (Doc. No. 6 at 16-19.)  Masterwood argues the ALJ further erred in failing to discuss Masterwood's hospitalization for suicidal thoughts and in "[f]ailing to account for the variability in Masterwood's symptoms."  (*Id.* at 18-19.)

The Commissioner responds that the ALJ "appropriately considered Plaintiff's mental impairment symptoms."  (Doc. No. 7 at 20.)  Contrary to Masterwood's assertion, the ALJ "expressly discussed" Masterwood's March 2021 hospitalization.  (*Id.* at 21.)

In his reply brief, Masterwood acknowledges the ALJ stated "that 'He was admitted to psychiatry[,]'" but that "[t]his brief sentence is the entirety of the fact that Plaintiff appeared with suicidal ideation and was hospitalized for three days . . . ."  (Doc. No. 8 at 3.)

To the extent Masterwood argues the ALJ erred in failing to consider the combination of his impairments (Doc. No. 6 at 19), the ALJ specifically found that Masterwood's impairments *or combination of impairments* did not meet or medically equal the listings.  (Tr. 23-27.)  The ALJ's decision demonstrates that the ALJ considered Masterwood's combination of impairments as required.  (*Id.*)  "[T]he fact that each element of the record was discussed individually hardly suggests that the totality of

---

[4] In fact, Masterwood raises this issue as a separate assignment of error at the end of his brief where the then details a Listing argument under a completely different heading.  (Doc. No. 8 at 16-19.)  The undersigned finds that, albeit in a disjointed and unorganized manner, Masterwood sufficiently developed his argument regarding the mental listings to avoid waiver.

the record was not considered, particularly in view of the fact that the ALJ specifically referred to 'a combination of impairments' in deciding that [the claimant] did not meet the 'listings.'" *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  *See also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("Further, the ALJ's decision reflects a comprehensive examination of Despins' medical impairments and explicitly concludes that Despins 'did not have any impairment or impairments that significantly limited his ability to perform basic work related activities.  That the ALJ may have discussed Despins' impairments individually 'hardly suggests that the totality of the record was not considered.'") (quoting *Gooch*, 833 F.2d at 592)).

Turning to Masterwood's argument regarding Listings 12.04 and 12.06, the ALJ provided a thorough analysis of Masterwood's mental impairments at Step Three, which included both positive and negative findings, and explained the reasoning for his findings for each of the "paragraph B" criteria.  (Tr. 25-27.)  Contrary to Masterwood's assertions, in the RFC analysis the ALJ discussed his March 2021 psychiatric hospitalization, and it consisted of an entire paragraph, not a single sentence:

> In March 2021, he indicated his mood was up and stable. He had low motivation, but was feeling better. His sleep was improving. (Exhibit C13F, page 5). Later that month, he had some suicidal and homicidal ideation that was likely induced by his steroid medication.  (Exhibit C12F, pages 6, 11). He was admitted to psychiatry. (Exhibit C12F, page 13). He felt someone was out to get him. (Exhibit C12F, page 15). He claimed to have a history of visual hallucinations with paranoia. He agreed to have his mental health medications adjusted. (Exhibit C12F, page 21). He was taken off a steroid and his psychosis improved and was expected to continue to improve. (Exhibit C12F, page 31). His anger improved and he was no longer having any hallucinations. (Exhibit C12F, page 44). His thinking was much more clear off steroids and with his alleged flare ending. (Exhibit C12F, page 47). While admitted, he was able to participate in group sessions and play guitar. (Exhibit C12F, page 45). He would actively participate in groups and interact appropriately with peers. (Exhibit C12F, page 49).

(*Id.* at 35.)

At bottom, Masterwood's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Masterwood interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

### 2.    Opinion Evidence

Masterwood argues the ALJ erred in evaluating four medical opinions: (1) a Functional Capacity Evaluation ("FCE") that predated the application; (2) a March 13, 2020 letter from Dr. Boyd; (3) a November 18, 2020 letter from Dr. Wasserbauer; and (4) the opinion of psychological consultative examiner Dr. Chuck.[5]  (Doc. No. 6 at 13-14, 16-17.)  With respect to the FCE, Masterwood argues that while it predated the application, his condition did not improve after that time, so the ALJ erred in failing to include any of those limitations in the RFC.  (*Id.*)  Masterwood asserts that because he was unrepresented, this constituted harmful error.  (*Id.*)  With respect to Dr. Boyd's opinion, Masterwood argues the ALJ erred in discounting the opinion on the basis that the opinion was based on Masterwood's subjective complaints when Dr. Boyd stated in the letter he had been seen on November 25, 2019 and the evaluation "revealed severe disability."  (*Id.*) (citation omitted).  With respect to Dr. Wasserbauer's opinion, Masterwood argues the ALJ erred in discounting the opinion on the basis that the opinion was

---

[5] Masterwood raised the challenge to the evaluation of Dr. Chuck's opinion in his third assignment of error at the end of his brief, again conflating multiple steps of the sequential disability evaluation in one assignment of error. The Court is out of patience with Plaintiff's counsel in having to spend considerable time and resources in attempting to decipher her arguments.

based on Masterwood's subjective complaints were based on testing and an evaluation performed at the Ohio State University Wexner Medical Center.  (*Id.* at 13-14.) (citation omitted).  Regarding these three opinions, Masterwood asserts they were supported by the record and there was no evidence to the contrary.  (*Id.* at 14.)  Masterwood maintains the ALJ failed to "adequately explain his findings regarding the persuasiveness of the treating sources" and so this matter should be remanded.  (*Id.*)  With respect to Dr. Chuck's opinion, Masterwood argues the ALJ erred in finding it unpersuasive when it predated the filing date because it "confirmed the fact that Masterwood had suicidal and homicidal thoughts."  (*Id.* at 17) (citation omitted).

The Commissioner responds that the ALJ "reasonably weighed all the evidence and resolved all conflicts in the testimony and evidence."  (Doc. No. 7 at 14.)

Since Masterwood's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant,

---

[6] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[7] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and

including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

(paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

After an exhaustive discussion of the record evidence, the ALJ considered the four challenged opinions as follows:

> The undersigned has considered the opinion of Dr. Jorethia Chuck. He performed a consultative examination on the claimant during the prior claim in February 2019. Dr. Chuck found the claimant would have problems understanding and remembering given his levels of intrusive thoughts. He found the claimant did not appear capable of maintaining attention and concentration and would have difficulty maintaining persistence and pace and performing tasks as he was often distracted by intrusive thoughts. He indicated the claimant should be able to respond appropriately to supervision. He found the claimant had impaired ability to withstand stress and pressures associated with daily work activities. He found the claimant's adjustment levels would likely deteriorate under the pressures of a normal work setting. (Exhibit C2F, pages 6-7). This opinion predated the prior decision and the protective filing date. It does not necessarily reflect the claimant's psychological functioning during the current period. This opinion is thus not persuasive.

> The undersigned has considered the opinion of physical therapist James Mcdonald.  In November 2019, he evaluated the claimant and found the claimant could do light work with the need to alternate between sitting and standing. He indicated the claimant could lift twenty pounds to waist level and fifteen pounds to shoulder level. He indicated the claimant could carry twenty-five pounds and push or pull twenty pounds. He found the claimant could occasionally bend, forward reach, fine coordinate, gross coordinate, pinch, simple grasp, climb stairs,

and walk.  He found the claimant should avoid static balancing, firm grasping, and squatting. (Exhibit C4F, page 6). This opinion was based on a detailed evaluation of the claimant. It was consistent with the examination findings and the claimant's daily functioning. However, this opinion did significantly predate the prior decision and the current relevant period. This opinion was thus partially persuasive.

The undersigned has considered the opinion of Dr. Sonji Boyd. In March 2020, he wrote a letter summarizing the claimant's allegations of significant symptoms since being prescribed Cipro. He described the claimant's subjective complaints. He asserted the claimant could no longer interact with his customers. (Exhibit C5F). Dr. Boyd has only been treating the claimant for a few months when he wrote this letter. Dr. Boyd also referenced the Oswestry Disability Index used in Mr. Mcdonald's evaluation of the claimant, but failed to make reference to Mr. Mcdonald's findings that the claimant could do full time light work with some additional limitations. This opinion was based mainly on the claimant's subjective allegations and was not consistent with the claimant's lab work, imaging, or examination findings. Thus, this opinion was not persuasive.

The undersigned has considered the opinion of Dr. Nancy Wasserbauer. In November 2020, she wrote a letter stating the claimant had Behcet's disease. She indicated its most common symptoms included painful ulcerations and inflammation of parts of the eye and joints. She indicated these sores typically lasted a few days and could come and go randomly. She noted his symptoms made it difficult for him to plan his daily activities, including work and social gatherings. She noted his residual functional capacity was "limited". (Exhibit C7F).  This opinion was based on the claimant's subjective reported symptoms. Such extreme limitations were not supported by the longitudinal treatment records. Thus, this opinion was not persuasive.

(Tr. 37-38.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 416.920c(a).  With respect to both Dr. Chuck's opinion and the FCE, as the ALJ found, they predated Masterwood's application date by over a year and almost a year, respectively, and Masterwood himself testified his conditions had improved since his application date.  (Tr. 37-38, 68.)  With respect to the opinions of Drs. Boyd and Wasserbauer, the ALJ found the opinions inconsistent with, and not supported by, other evidence in the record, specifically the FCE, lab work, imaging, examination findings, and longitudinal treatment records.  (*Id.* at 38.)  Furthermore, to the extent Masterwood disputes the ALJ's determination that they were based on his subjective complaints,

34

the ALJ explained in detail that Masterwood's Behcet's diagnosis "was based entirely on [his] subjective complaints and were not consistent with testing, imaging, or examination findings.  The claimant repeatedly reported symptoms that were not documented on examination." (*Id.* at 39.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Masterwood would weigh the evidence differently, it is not for the Court to do so on appeal.

### 3.    Subjective Symptom Evaluation

Masterwood argues that he complained of pain throughout his body, including from inflammation from his Behcet's syndrome, and that his testimony supported the medical evidence in the record.  (Doc. No. 6 at 14-15.)  Masterwood asserts remand is required "to consider the effects of [his] pain symptoms as the pain interfered with his ability to perform substantial gainful activity on a full-time and sustained basis." (*Id.* at 15.)  Masterwood maintains that the ALJ's failure to find his pain would interfere with his ability to sustain concentration, as supported by the record and his testimony, was harmful and reversible error. (*Id.*)

The Commissioner responds that the ALJ "sufficiently analyzed all of [Masterwood's] symptomology and explained why it did not justify greater restrictions in the RFC." (Doc. No. 7 at 18.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

[those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[8] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[9] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should

---

[8] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the September 13, 2021 hearing.

[9] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

consider.[10]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Masterwood's testimony and other statements regarding his symptoms and limitations.  (Tr. 28-30.)  The ALJ determined Masterwood's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 30.)  However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id*.)  Specifically, the ALJ found as follows:

> The claimant described extreme limitations in his functioning that were not supported by the record. (Exhibit C5E). He described being bedbound for an average of twenty hours every day and that he was sometimes bedbound for weeks at a time. He claimed to do absolutely no chores or cooking as it was completely impossible as his joints were constantly inflamed. Yet at the time of the hearing, he was living alone and described being able to cook and do a variety of household chores. He claimed he did not drive and that he went outside once a month. However, at the hearing, he indicated he would drive to the YMCA every other day.
>
> Records mentioned him riding his bicycle to the bookstore daily to read. (Exhibit C6F, page 29). He described one of his ways of coping with things was to walk. (Exhibit C6F, page 11). He described walking for exercise daily. (Exhibit C9F, page 31). At times, he stated that when he was not sick, he would bicycle and walk. (Exhibit C12F, page 27). After a house fire, he was busy focusing on doing repairs, cleaning, and renovations of the home. (Exhibit C13F, pages 15, 29, 32). His activities suggested a far greater degree of physical functioning than he alleged.

---

[10] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

He described violent personality changes and that he was afraid of people. Yet during an inpatient hospital stay, he was able to interact appropriately with people in groups and was social with his peers. (Exhibit C12F, page 49). Despite his alleged brain fog symptoms, he was able to take a college class. (Exhibit C9F, pages 21, 31, 45). He was learning German. (Exhibit C6F, page 29). He could play the guitar. (Exhibit C6F, page 11; Exhibit C13F, page 10). He liked to read non-fiction. (Exhibit C12F, page 27).  His activities suggested a far greater degree of mental functioning than he alleged.

The claimant had a questionable diagnosis of Behcet's disease. He was given a diagnosis of Behcet's based on his alleged symptoms and him telling his doctors that he had chronic uveitis in his eyes. (Exhibit C8F, page 33; Exhibit C10F, page 7). However, a review of his eye exams showed he actually had no evidence of uveitis. (Exhibit C14F, pages 107, 115). A rheumatologist found the claimant to not have any physical exam criteria to meet a diagnosis of Behcet's disease and his symptoms were subjective in nature.  (Exhibit C14F, page 107).  He was given a presumptive diagnosis of Behcet's based on his subjective positive response to medication. (Exhibit C14F, page 100).

Thus, his diagnosis of Behcet's was based entirely on the claimant's subjective complaints and were not consistent with testing, imaging, or examination findings. The claimant repeatedly reported symptoms that were not documented on examination. For instance, he claimed to have inflammation in every joint and organ. Yet he was repeatedly noted to not have any joint swelling and imaging did not show inflammation in his joints or organs. He claimed to have inflammation of his brain, but this was not seen in repeated brain imaging. There was no evidence of small vessel vasculitis impacting the skin or kidneys and various lab work was unremarkable. (Exhibit C10F, page 7). He repeatedly had normal gait, strength, sensation, range of motion, and intact cranial nerves. One doctor noted the claimant may have a poor understanding of his illness or may be a hypochondriac. (Exhibit C1F, page 17). Thus, the claimant's allegations were not entirely consistent with the evidence.

While the claimant had new diagnoses attributed to him, his subjective complaints had remained the same since the prior decision. The undersigned finds there to be no material evidence to support a deviation from the findings of the prior decision. The undersigned thus finds the claimant was limited to light work, with postural, manipulative, and mental limitations.  All evidence has thus been considered in assessing the claimant's residual functional capacity.

(*Id.* at 38-40.)

The undersigned finds substantial evidence supports the ALJ's assessment of Masterwood's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Masterwood's allegations of disabling conditions.  (*Id.* at 28-40.)  Contrary to Masterwood's allegations,

the ALJ credited some of Masterwood's subjective symptoms but did not accept them to the extent alleged by Masterwood because of findings on examinations and his daily activities, factors to be considered under the regulations.  (*Id.*)  An ALJ can consider a claimant's activities of daily living when assessing symptoms.  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may...consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (internal citations omitted)).  In addition to resolving conflicts in the medical evidence, the ALJ used Masterwood's activities of daily living to partially discount his testimony regarding the level of severity of his symptoms.  *See Phillips v. Comm's of Social Sec.*, No. 5:20 CV 126, 2021 WL 252542, at *10 (N.D. Ohio Jan. 26, 2021).  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability. (Tr. 31-40.)

## C.    Third Assignment of Error: Step Five

As part of his due process argument in his first assignment of error, Masterwood raises a run-of-the-mill Step Five challenge to the hypotheticals posed to the VE by the ALJ and then, in a single, unsupported sentence, asserts, "This matter should be remanded as Masterwood was not accorded a full and fair hearing when the vocational witness was not asked a hypothetical question incorporating all his limitations." (Doc. No. 6 at 10.)  The undersigned finds any due process argument on this issue waived for lack of development.  However, the undersigned proceeds to analyze Masterwood's remaining Step Five challenge.

The Commissioner responds that the ALJ was not required to incorporate any limitations beyond those he found to be supported by the evidence, and furthermore Masterwood fails to identify additional work-related functional limitations that the ALJ should have adopted but did not.  (Doc. No. 7 at 12.)

At Step Five of the sequential disability evaluation, the Commissioner bears the burden in proving work exists in the national economy that a claimant can perform.  "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 416.966(b).  A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

While Masterwood argues the ALJ failed to include any limitations regarding his inflammation and that he "would be confused, suicidal, and homicidal" and failed to pose "any questions which incorporated his limitations in the "paragraph B" criteria (Doc. No. 6 at 10), the ALJ asked the VE several hypotheticals that included various physical and mental limitations.  (Tr. 73-76.)  The RFC adopted by the ALJ included various limitations based on Masterwood's physical and mental impairments, included limited reach with his right upper extremity and being limited to simple, routine, and repetitive tasks, goal-oriented but not production-rate paced work, and a static work environment in a routine work setting with few changes and where any such changes would need to take place gradually and occur infrequently.  (*Id.* at 27.)

There is no error.

40

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


Date: August 1, 2022                    _ s/ Jonathan Greenberg_
                                        Jonathan D. Greenberg
                                        United States Magistrate Judge


## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _Berkshire v. Beauvais_, 928 F.3d 520, 530-31 (6th Cir. 2019).**